UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

STACY ALEXANDER, and         )
                                      )
KIM ROGERS,                 )
                                      ) .
     Plaintiffs,          )
                                      ) Cause No. 3:10-cv-00908-WJS-DGW
v.                     )
                                      )
CASINO QUEEN, INC.,     )
                                      )
     Defendant.        )

**PLAINTIFF KIM ROGERS'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Kim Rogers worked as a cocktail waitress at Defendant Casino Queen, Inc.'s casino in East St. Louis, Illinois, for over fifteen years. Ms. Rogers and her co-Plaintiff Stacy Alexander, also a long-time cocktail waitress at the casino, are African American. They filed this lawsuit in November 2010 alleging that the Casino Queen subjected them to racial discrimination and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981. This matter is now before the Court on Defendant's Motion for Summary Judgment.

**FACTS**

<u>Defendant's Treatment of Plaintiff</u>

Ms. Rogers began her employment with the Casino Queen in 1996. She resigned her employment on May 20, 2010. Throughout her employment she worked as a cocktail waitress. For the reasons discussed in the Court's Memorandum and Order (Doc. 21) on

1

Defendant's Motion to Dismiss, Ms. Rogers's claims are based on her experiences between October 11, 2007 and May 20, 2010.

During the period from October 11, 2007 through May 20, 2010 (and for some time before that), Kelly Carey was the Food and Beverage Manager with responsibility over, among other groups, Defendant's cocktail waitresses and bartenders.  During that entire period Ms. Carey's boss was Dominic Gramaglia, the Food and Beverage Director.  Mr. Gramaglia reported to the casino's General Manager, initially Tom Monaghan and later Jeff Watson.  Ms. Carey, Mr. Gramaglia, Mr. Monaghan and Mr. Watson are Caucasian. (Statement of Kim Rogers, Exhibit 1, para. 1; Deft's Exhibit B)

Plaintiff was subjected to more scrutiny than her white co-workers.  Throughout the relevant time period, Ms. Rogers observed that Ms. Carey watched her more closely than she did the white cocktail waitresses with whom she worked.  For example, frequently when Ms. Rogers left the casino floor to use the restroom, Ms. Carey came in and stood at the sink washing her hands.  It appeared that she was monitoring how long Ms. Rogers spent in the restroom.  Ms. Rogers did not observe Ms. Carey following the white cocktail waitresses into the restroom.   She also frequently noticed Ms. Carey watching her when she returned from her scheduled break, as if to make sure that she returned on time.  In contrast, she saw white cocktail waitresses taking breaks with Ms. Carey, at times that they (the cocktail waitresses) were not scheduled for breaks.  (Ex. 1, para. 2)

Plaintiff was disciplined more harshly, and not accorded the same privileges, compared to her white co-workers.  Ms. Rogers experienced and observed a double standard based on race, under which white cocktail waitresses and bartenders were treated more

favorably than black cocktail waitresses and bartenders.  Ms. Rogers started making notes of some of the incidents as they occurred.  (Ex. 1a)  Specific incidents included:

Ms. Rogers received a write-up for being tardy on November 3, 2008.  The time records showed that she clocked in at 7:43 a.m. for her 7:45 a.m. shift.  When she questioned Kelly Carey about this Ms. Carey said it was because she (Ms. Rogers) was not at her work station by 7:45.  Since it only took a minute to get from the time clock to her work station, Ms. Rogers did not believe she was late.  (The write-up said she got there at 7:48.(Ex. 1, para. 4)  In contrast, Ms. Rogers observed a white cocktail waitress, Kim Lay, repeatedly arrive late to her work station.  Ms. Rogers noted Ms. Lay arriving after her shift was supposed to start  42 times in an eleven month period between December 23, 2008 and November 11, 2009.  (Ex. 1, para. 5)  The rule was if an employee receives nine tardies in a rolling calendar year, she would be terminated.  If Kim Lay had been written up even one fourth of the times she was late, she should have been terminated in 2009.  Yet Kim Lay was still employed when Ms. Rogers left the Casino Queen in May 2010.  (Id.; see also Deft's Ex. A, p. 135-141)[1]

On many occasions Kelly Carey denied Ms. Rogers's requests for vacation or personal days off without explanation, but she routinely approved the requests of the white cocktail waitresses.  The last week of May 2009 Ms. Carey denied Ms. Rogers's request for a day off the following Thursday, but within a few days she approved the request of a white cocktail waitress named Michelle, for a day off the following Sunday, even though Sundays were

_____

[1]On November 11, 2009 Ms. Rogers observed Ms. Carey standing by Ms. Lay's work station when Ms. Lay arrived at 7:50 for her 7:45 shift.  (Ex. 1, para. 6)

busier days than Thursdays.  (Ex. 1, para. 7)

In December 2008 Ms. Rogers's aunt died and she asked Ms. Carey for an emergency day off to attend the funeral.  Her request was denied.  Several months later a white cocktail waitress, Michelle, requested an emergency day off because of an injury to her sister-in-law.  Ms. Carey granted that request. (Id., para. 8; see also Deft's Ex. A, p. 118-119)

On more than one occasion Kelly Carey wrote Ms. Rogers up for allegedly spending too much time standing at the bar, when she was in fact waiting to pick up drinks.  (Id., para. 9)  Ms. Rogers observed many occasions where white cocktail waitresses stood at the bar chatting with each other or with white bartenders for extended periods of time.   On November 17, 2009 Kim Lay spent an hour on the casino floor talking to her boyfriend, who was also an employee.  Ms. Carey passed by them twice before she finally said something to them.  Ms. Lay's personnel file does not indicate a write-up for that date.  (Id., para. 10)

On June 20, 2008 Ms. Rogers received a write up for having food at her work area. When she reported her write up to her shop steward Keith Benson, Mr. Benson told her that on that same day, white cocktail waitress Brandie was caught by management eating food at the bar.  Her food was taken away but she did not get a write-up.  (Ex. 1, para. 11)  Ms. Rogers saw white cocktail waitresses eating on the casino floor many times; for example, Corena Piatt on February 11, February 13,  February 25, and April 3, 2009.  (Id., para. 12; see also Deft's Ex. A, p. 108-109)

On April 7, 2009 Ms. Rogers overslept due to a medication she was taking after having oral surgery.  She arrived at work about two and a half hours after her shift had started.  Kelly Carey immediately sent her home and did not allow her to work the rest of her

4

shift.  (Ex. 1, para. 13)  Ms. Rogers was charged with an absence, which then resulted in her being suspended for a day.  She lost the pay and tips she would have earned in five and a half hours on April 7 plus what she would have earned on the full day she served the suspension. In addition, she lost out on the bonus she would otherwise have received for 2009, because employees who are suspended any time during the year do not receive a bonus.  (Ex. 1, para. 13)

In contrast to Ms. Rogers, Nicole Khoury, a white cocktail waitress, was allowed to work the rest of her shift (and was not charged with an absence) when she arrived over two and a half hours late on May 29, 2009.  In fact, Ms. Khoury was a "no-call, no-show," which is supposed to result in termination, but Defendant called her to come in to work anyway. Food and Beverage Director Dominic Gramaglia admitted to Ms. Rogers that Ms. Khoury was treated differently than her, with no more explanation than "that shouldn't have happened." (Ex. 1, para. 14; see also Deft's Ex. A, p. 66-68, 72, 81-82)

The disparate treatment continued up to the time of Ms. Rogers's resignation.  On May 20, 2010 she attempted to give two weeks' notice that she was resigning.  Defendant's Human Resources representative called Ms. Rogers at home that very day and told her not to come back to work.  Ms. Rogers asked if she could revoke her notice so that she could work those two weeks as she had planned to do, but the answer was no.  When Ms. Rogers attempted to report to work the next day anyway, Casino Queen security guards escorted her off the casino floor and out of the building, and told her not to come back.  She received her base pay for those two weeks but lost the opportunity to earn tips.  (Id., para. 25)

Ms. Rogers had observed white cocktail waitresses, including Kim Turner, Brandie,

Kim Gann and others, publicly announcing their resignations and continuing to work for two weeks afterward. (Id., para. 26; see also Deft's Ex. A, p. 98-100)

Plaintiff was treated less favorably than her white co-workers with respect to floor assignments. At any given time, there would be between three and six cocktail waitresses working on the casino floor. Each waitress was assigned to cover a specific area of the floor. The area might include slot machines, gaming tables (black jack, craps, etc.) or some of each. The area to which a cocktail waitress was assigned was important because the guests in some areas, on average, tipped more than the guests in other areas. For example, a waitress typically did not receive big tips from guests playing the "penny slots," so the area of the floor containing the penny slot machines was not a good area to work. On the other hand, an area containing "high roller" tables was a desirable area, because the average tips were higher. (Id., para. 15)

The cocktail waitresses periodically bid for shift assignments based on seniority. A shift assignment consisted of a combination of days and hours of work plus a designated area of the casino floor. For example, an assignment might be Sunday - Thursday, 3:30 - 11:30 p.m., area "1A." The most senior waitress who wanted that assignment could get it by bidding on it. She would then expect to work those days and hours, serving the guests at the slot machines and/or gaming tables that made up area "1A" until the schedules were rebid sometime in the future. (Id., para. 17)

.On days when a cocktail waitress was absent or went home early, the remaining cocktail waitresses were given new floor assignments, for that day only, so that the area assigned to the absent waitress would be covered. (Id., para. 19)

By 2008 Ms. Rogers was the sixth most senior cocktail waitress, so she could bid on and receive an area of the floor that had good potential for tips.  (Id., para. 18)  However, when day-by-day adjustments were made to cover for an absent waitress, Ms. Rogers was almost always moved from her assigned area of the casino floor to a less desirable area (like the penny slots) while white cocktail waitresses were reassigned to cover desirable sections of her bidded area.  Ms. Rogers estimates this happened several times per week on average.  (Id., para. 19; see also Deft's Ex. A, p. 148)

Tips were a large part of Ms. Rogers's income.  Her base pay was between $7 and $8 per hour, about $60 for an eight hour day.  Depending on the area of the floor she was working, tips could be anywhere from $40 to $160 or more per day.  When she was reassigned to a less lucrative area of the casino on an ad hoc basis, it had a significant effect on her income.  (Id., para. 16)

Plaintiff protested the disparate treatment, to no avail.  Between October 11, 2007 and May 20, 2010 Ms. Rogers complained to management about the treatment she received.  She frequently expressed to Kelly Carey that she thought she was being treated differently because of her race.  She lodged several race discrimination complaints with Human Resources Director Betty Smith.  She complained to General Manager Tom Monaghan, in addition to Dominic Gramaglia, about being treated differently than Nicole Khoury as described above.  (Id., para. 27)

Ms. Rogers also complained to Mr. Gramaglia on several occasions about the day-by-day changes to her assigned area that caused her to earn less tips.  On one occasion when she confronted him about a reassignment he accused her of insubordination and sent her home

before her shift was over.  (<u>Id.</u>, para. 28; <u>see also</u> Deft's Ex. A, p. 183)

Sometime in 2009 Security Director Ed Muzzey and Human Resources representative Ida Danley interviewed Ms. Rogers about her race discrimination complaints.  They told her they were going to conduct an investigation.  She never heard back from them or anyone else about any investigation.  (<u>Id.</u>, para. 29)

In March 2010 Ms. Rogers told Human Resources representative Kim Cushon that she believed Kelly Carey was watching her more closely than she was watching the white cocktail waitresses, and that she thought that Ms. Carey was harassing and retaliating against her.  Ms. Cushon responded to Ms. Rogers two weeks later, saying it was Ms. Carey's "right" to single her out.  (<u>Id.</u>, para. 30)

Defendant's Treatment of other African American Employees

Ms. Rogers's co-Plaintiff, Stacy Alexander, suffered similar experiences of unfavorable treatment compared to her white co-workers during the relevant time period. Ms. Alexander's Statement is attached hereto as Exhibit 2.  Ms. Rogers hereby incorporates by reference the "Facts" section of Ms. Alexander's Memorandum in Opposition to Defendant's Motion for Summary Judgment, and the evidence cited therein.

Beginning in September 2007, 72 African American employees and former employees of Defendant joined a consolidated lawsuit, filed in this Court, accusing Defendant of race discrimination and unlawful retaliation.  <u>Riley-Jackson, et al. v. Casino Queen, Inc.</u>, No. 07-cv-0631-MJR-PMF (S.D.Ill.) (hereinafter "Riley-Jackson").  Among the plaintiffs were the three longest-serving black cocktail waitresses other than Ms. Alexander and Ms. Rogers: E'twon Meadows, Nicole Wolf and Martina Conley.   The plaintiff group also included a

number of African American bartenders who, like the cocktail waitresses, reported to Kelly Carey and Dominic Gramaglia. (Ex. 1, para. 1) Ms. Meadows, Ms. Wolff and Ms. Conley all testified that they had experienced unfavorable treatment that was similar to that experienced by Ms. Rogers and Ms. Alexander, at the hands of the same management team, during a period of time that overlaps the period encompassed by this lawsuit.

Nicole Wolf was first employed by the Casino Queen in 1993 and had been a cocktail waitress since 2003. Her deposition is at <u>Riley-Jackson</u>, Doc. 159. Of particular relevance to Ms. Rogers's claims, Ms. Wolf testified that she had personally experienced and observed that white cocktail waitresses were treated more favorably than black waitresses with respect to tardies (Doc. 159, p. 23-27), taking extended breaks (<u>Id.</u>, p. 19, 22-23, 81-82, 92-93), ad hoc floor assignments (<u>Id.</u>, p. 62-65), eating at their workstations (<u>Id.</u>, p. 49-50), violations of the uniform policy (<u>Id.</u>, p. 95-96), and requests for days off (<u>Id.</u>, p. 73-75). She testified that a white cocktail waitress named Susan arrived more than two hours late but, like Ms. Khoury and in contrast to Ms. Rogers, was allowed to work the rest of her shift (<u>Id.</u>, p. 37-40).

Martina Conley began working as a cocktail waitress in 1996 and continued through the period relevant to this lawsuit. Her deposition is at <u>Riley-Jackson</u>, Doc. 141. Ms. Conley testified, among other incidents of unfavorable treatment, that she, like Ms. Rogers, was disciplined for eating at her work station while white employees were not (Doc. 141, p..22-46), and was treated unfavorably compared to white co-workers with respect to call-offs (<u>Id.</u>, p. 60-62) and tardies (<u>Id.</u>, p. 52-53, 138-140).

E'twon Meadows worked for Defendant as a cocktail waitress since 1993. Like Ms.

Wolf and Ms. Conley, Ms. Meadows testified to experiences that mirrored those of Ms. Rogers and Ms. Alexander. Ms. Meadows's Affidavit is at <u>Riley-Jackson</u>, Doc. 209-7. In particular, Ms. Meadows observed and experienced management's favoritism toward white cocktail workers when floor assignments were rearranged on an ad hoc basis. (Doc. 209-7, para. 31) She was removed from her bidded area in favor of a less senior, white cocktail waitress, Brandie Schwab, on more than one occasion in July 2008. Ms. Meadows met with Tom Monaghan, Jeff Watson, Dominic Gramaglia and Kelly Carey to talk about the unfair schedule changes. (<u>Id.</u>) Mr. Monaghan admitted that seniority should be the key factor (id.) yet, as Ms. Rogers attests, Ms. Carey continued to ignore it in making schedule changes.

<u>Observations and Experience of Defendant's Human Resources Director</u>

Betty Smith was employed as Defendant's Human Resources Director from September 2007 to January 6, 2009, approximately the first half of the time period encompassed by this lawsuit. Ms. Smith gave extensive testimony in connection with the <u>Riley-Jackson</u> lawsuit, and produced hundreds of pages of notes she had taken during her tenure with Defendant. Ms. Smith's full deposition is at <u>Riley-Jackson</u>, Doc. 115, 116 and 117, and her notes are at <u>Riley-Jackson</u>, Docs.183-3 through 183-10.

Toward the beginning of her stint as Defendant's Human Resources Director, Ms. Smith conducted a series of meetings with employees in the Food and Beverage Department, including cocktail waitresses. (<u>Riley-Jackson</u>, Doc. 116 at p. 126). Ms. Rogers participated in these meetings. (Ex. 1, para. 31). During the meetings, Ms. Smith received complaints of racial discrimination regarding Kelly Carey. (Doc. 116 at p. 142). During one group meeting on December 3, 2007, it was reported to Ms. Smith that Ms. Carey had a set of rules

10

for blacks and a different set of rules for whites. (Doc. 116 at p. 142-143).  In addition, Ms. Smith received complaints related to job assignments and how they were changed when one or more cocktail waitresses called off work. (Doc. 116 at p. 144).  These (re)assignments were a big issue because certain stations were "money makers." (Doc. 116 at p. 145). Ms. Smith testified that cocktail waitresses reported to her that Ms. Carey was hand picking the white cocktail waitresses for the better stations, versus the African-Americans. (Doc. 116 at p. 145).  Ms. Smith testified that the cocktail servers, as well as bartenders, expressed to her several times that when they would go to Dominic Gramaglia with a complaint regarding Ms. Carey that he always sided with Ms. Carey. (Doc. 116 at p. 153). Ms. Smith testified that, based on her observations, she found that to be true in most cases. (Doc. 116 at p. 153).

Ms. Smith testified that sometimes employees would attempt to grieve these complaints through the Casino Queen's grievance process. (Doc. 116 at p. 148). Ms. Smith testified that while her initial intake statement from the employee was always shared during this process, the results of an investigation, if any was performed, sometimes were not. (Doc. 116 at p. 148-149). Ms. Smith found it unusual that the investigation findings were, on certain occasions, not even presented to the grievance committee. (Doc. 116 at p. 149). Ms. Smith testified that although she was a member of the grievance committee, in many cases a decision had already been made by management, and the committee never had a chance to rule one way or another. (Doc. 116 at p. 149-150).

Ms. Smith was a voting member of the Guaranteed Fair Treatment committee, which was another avenue through which employees could contest disciplinary issues. (Doc. 116 at p. 150). There were three voting members, along with one alternate. (Doc. 116 at p.

239-240). All three of the voting members, plus the alternate, were African American. (Doc. 116 at p. 239-240). However, Ms. Smith testified that there were many times where General Manager Tom Monaghan and General Counsel Jeff Watson, who were not voting members of the committee, would nonetheless make decisions and then tell the committee what their decisions were or coerce them into their decision. (Doc. 116 at p. 150; Doc. 117 at p. 300, 313). Ms. Smith testified that "the end result of the process was not always fair because it was not truly a decision by the voting members of the committee." (Doc. 117 at p. 314). Ms Smith testified that she was involved in most of the grievance and Guaranteed Fair Treatment hearings, and she observed inconsistencies in the way that people were treated which were made "absolutely along racial lines." (Doc. 117 at p. 73, 342). She felt that the three voting members on the committee, all of whom were African-Americans, were being used as a front for the two white individuals actually making the decisions. (Doc. 116 at p. 243, 272).

When Ms. Smith first started as the Human Resources Director for the Casino Queen, her job duties included all aspects of human resources, including responsibility for conducting investigations of racial complaints. (Doc. 115 at p. 26-27, 29). However, after a confrontation with General Counsel Jeff Watson in which she expressed concerns about Defendant's practices, all responsibility for conducting investigations was transferred to Security Director Ed Muzzey. (Doc. 115 at p. 28-29; Doc. 116 at p. 88, 166; Doc. 117 at p. 26, 70-71, 298). Ms. Smith was surprised by this change since, in her experience, the Human Resources Director is typically the official responsible for conducting investigations of employee complaints, (Doc. 115 at p. 29-30), and there was some question as to whether Mr. Muzzey was trained to properly conduct HR investigations. (Doc. 115 at p. 31-32, 34, Doc.

12

116 at p. 23-24, 167; Doc. 117 at p. 104-105).  Over the course of her employment, Ms. Smith was stripped of most of her responsibilities for handling employee complaints.  (Doc. 115 at p. 36-37; Doc. 116 at p. 146-147).

Ms. Smith testified that General Manager Tom Monaghan, the highest ranking official at the casino, was racially prejudiced. (Doc. 116 at p. 278-279). She observed how Mr. Monaghan treated African-American managers in meetings in comparison to other managers. (Doc. 116 at p. 279).  She also noted that she was not allowed to do any investigation into complaints against non-African-American managers, but when a complaint was made against an African-American manager or African-American employee he was more welcoming of that information when she brought it to him. (Doc. 116 at p. 279, 281-282).

Ms. Smith also testified that in staff meetings profanity and jokes about African-Americans were made and Mr. Monaghan never stopped them. (Doc. 116 at p. 280; Doc. 117 at p. 335).  She testified that she had observed Tom Monaghan and others use the term "those people" numerous times in reference to groups of African-Americans. (Doc. 117 at p. 335). She also testified that the term "back-of-the-house people" was used during these meetings as slang for African-Americans. (Doc. 116 at p. 280). She testified that this was always a very negative comment. (Doc. 117 at p. 337). She never heard positive comments about the "back-of-the-house people" or about what they were doing. (Doc. 117 at p. 337). She testified that not only did Mr. Monaghan participate in those types of references, "he led a lot of them." (Doc. 116 at p. 280). "So I felt like it was extremely racially charged." (Doc. 117 at p. 335).

Ms. Smith had over 35 years of experience in the field of human resources, having

headed-up the Human Resources Departments for various large corporations such as Coca-Cola, Save-A-Lot Food Stores and McDonalds prior to her employment by Defendant. (Doc. 115 at p. 8-18).  Ms. Smith testified that, based on her training and years of experience in the field of Human Resources, as well has her observations during her tenure as the Human Resources Director at the Casino Queen, she concluded:

- that African-American employees received disparate treatment with respect to discipline at the Casino Queen. (Doc. 117 at p. 94);

- that in certain departments, including Food and Beverage, African-American employees received disparate treatment with respect to promotions and scheduling.  (Doc. 117 at p. 94-95);

- that there existed a racially hostile work environment at the Casino Queen that was "pervasive and systematic." (Doc. 117 at p. 89-91, 319);

- that there was pervasive and systematic racial discrimination at the Casino Queen. (Doc. 117 at p. 92);

- that there existed racial retaliation for having exercised Title VII rights or exercising rights regarding race at the Casino Queen. (Doc. 117 at p. 93); and

- that  the Casino Queen did not adequately address those complaints of racially hostile work environment, racial discrimination and racially based retaliation. (Doc. 117 at p. 93). Ms Smith testified that she based this on her observations that the same issues and complaints continued to be brought to her. (Doc. 117 at p. 93-94). Indeed, Ms. Smith testified that the actions of Mr. Monaghan and Mr. Watson to limit or restrict her ability to perform her job with respect to complaints of racial discrimination were, in her opinion,

done to thwart her efforts to address racial discrimination, hostile work environment and retaliation. (Doc. 117 at p. 98).

## ARGUMENT

### Standard for Summary Judgment

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if (but only if) the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. Proc. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); National Athletic Sportswear, Inc. v. Westfield Ins. Co., 528 F.3d 508, 512 (7th Cir. 2008). As Judge Reagan stated in Riley-Jackson:

> What the undersigned may *not* do in deciding a summary judgment motion is evaluate the weight of the evidence, judge the credibility of witnesses or determine the truth of the matter. The court's only role is to determine whether there is a genuine issue of triable fact. National Athletic, 528 F.3d at 512, citing Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994).

> A factual dispute is genuine "only if a reasonable jury could find for either party," and disputed facts must be outcome-determinative to be "material" and

15

preclude summary judgment. <u>Montgomery v. American Airlines, Inc.</u>, 626 F.3d 382, 389 (7th Cir. 2010). <u>See also</u> <u>Van Antwerp v. City of Peoria, Illinois</u>, 627 F.3d 295, 297 (7th Cir. 2010). But, as the Seventh Circuit Court of Appeals reiterated just days ago, in assessing the record before him, the undersigned Judge bears in mind that "the party opposing the motion gets the benefit of all facts that a reasonable jury might find." <u>Loudermilk v. Best Pallet Co., LLC.</u>, -- F.3d --, 2011 WL 563765, *2 (7th Cir. Feb. 18, 2011).

<u>See</u>, <u>e.g.</u>, <u>Riley-Jackson</u>, Doc. 527 (denying summary judgment against cocktail waitress E'twon Meadows.)

The Seventh Circuit recognizes that "summary judgment is frequently inappropriate in discrimination cases because intent, and therefore credibility, is often a crucial issue." <u>McMillian v. Svetanoff</u>, 878 F.2d 186, 188 (7th Cir. 1989).

## Direct Method of Proving Discrimination

Under the federal employment discrimination statutes, a plaintiff may show discrimination (or retaliation) under either the "direct" or the "indirect" method of proof. <u>Brown v. Illinois Department of Natural Resources</u>, 499 F.3d 675, 681 (7th Cir. 2007); <u>Diaz v. Kraft Foods Global, Inc.</u>, 653 F.3d 582, 586-587 (7th Cir. 2011). Under the direct method, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. <u>Hasan v. Foley & Lardner LLP</u>, 552 F.3d 520, 527 (7th Cir. 2008). By contrast, the indirect method of proof involves a "certain subset of circumstantial evidence that includes how the employer treats similarly situated employees and conforms to the prescription of <u>McDonnell Douglas Corp. v. Green</u>." <u>Faas v. Sears Roebuck & Co.</u>, 532 F.3d 633, 641 (7th Cir. 2008).

The Seventh Circuit has been critical of this nomenclature, because the phrase "direct *method*" erroneously implies that an employee must proceed with direct *evidence*. <u>See Luks</u>

16

v. Baxter Healthcare Corp., 467 F.3d 1049, 1052 (7th Cir. 2006) (the distinction between the two avenues of proof is "vague," and the terms "direct" and "indirect" are themselves "somewhat misleading....")  Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination.  Diaz, 633 F.3d at 587.  This type of evidence is rare.  Id.  "Direct" proof of discrimination, however, is *not* limited to near-admissions by the employer that its decisions were based on a proscribed criterion, but also includes circumstantial evidence which suggests discrimination through "a longer chain of inferences."  Id., quoting Hasan, 552 F.3d at 527.  A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue on whether discrimination motivated the employment action.[2]

Seventh Circuit caselaw points to three categories of circumstantial evidence that may be used to prove discrimination under the direct method: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. Id., citing Darchak v. City of Chicago Bd. of Educ., 580 F.3d 622, 631 (7th Cir. 2009).  A plaintiff need not produce evidence in each category to survive

---

[2]In its Memorandum in Support Defendant erroneously equates the direct method of proof with the production of direct evidence.  It argues that Plaintiff cannot use this method unless she produces evidence of admissions of discriminatory motive or the use of "racial slurs, statements of dislike for a particular race, or remarks" derogating Plaintiff's race, "directed at [her] by the person who made the adverse employment decision."  Memorandum in Support at p. 20.  To the contrary, Seventh Circuit caselaw makes it clear that such evidence is one (rare) type, but by no means the only type, of evidence that may be used to prove Plaintiff's case under the direct method.

summary judgment. Id.

In Diaz v. Kraft Foods Global, Inc., two Hispanic plaintiffs claimed that their employer denied them promotions based on their race.  In reversing summary judgment for the employer, the Seventh Circuit held that the district court failed to consider (or discounted the importance of) circumstantial evidence from which an inference of discrimination could be drawn, including:

- evidence that the employer assigned Hispanics to disfavored tasks;

- evidence of irregularities in the promotion process;

- evidence that an Hispanic employee who *was* promoted was assigned to an undesirable shift; and

- evidence of a non-decisionmaker's statement, to an employee other than the plaintiffs, about a decision that did not involve the plaintiffs, that the decisionmaker preferred a particular employee because he was "white like him."

Diaz, 653 F.3d at 587-589.  The Court concluded that the plaintiffs' circumstantial evidence precluded summary judgment against them under the direct method of proof.

_____Ms. Rogers's circumstantial evidence includes not only the many incidents of unequal treatment about which she testified, but also:

- evidence that Defendant treated other black cocktail waitresses, including Ms. Alexander, Nicole Wolf, E'twon Meadows, and Martina Conley, less favorably than white waitresses with respect to, among other things, discipline and floor assignments.  Kelly Carey was responsible for discipline and scheduling of all cocktail waitresses during the relevant time (Deft's Ex. B);

- evidence that when Human Resources Director Betty Smith began looking into employees' race discrimination complaints, Defendant stripped her of her responsibility for investigating employee complaints and gave it to Security Director Ed Muzzey;

- evidence that Mr. Muzzey interviewed Ms. Rogers about her race discrimination complaints and told her that he was going to conduct an investigation, but she never heard anything about the investigation again;

- evidence that the African American members of the Guaranteed Fair Treatment committee were used as a "front" for decisions that were dictated to them by the white General Manager and General Counsel and that decisions were made "absolutely along racial lines";

- evidence that Tom Monaghan, the highest level manager at the casino, did not treat African American managers with the same respect that he accorded white managers, that he tolerated racial jokes and profanity in management meetings, and that he derogatorily referred to African American employees as "back of the house" people;

- evidence that Defendant disproportionately hired African Americans to work in jobs that did not have much customer contact, but preferred whites for visible positions such as cocktail waitress.  (Riley-Jackson, Doc. 117, p. 322-323)

- evidence that only seven of 31 cocktail waitresses during the relevant time period (22.5%) were African American, despite the fact that the casino is located in a heavily African American community (Ex.3)

- evidence that Defendant's own Human Resources Director concluded that race discrimination was systematic and pervasive in Defendant's operations, that a racially hostile

environment existed, that Defendant failed to take adequate steps to address the racial discrimination and hostile environment, and that it systematically retaliated against employees who complained about race discrimination.

The circumstantial evidence marshaled by Ms. Rogers is significantly weightier than that proffered by the plaintiffs in Diaz. It is sufficient to preclude summary judgment in favor of Defendant under the direct proof method of analysis.

<u>Indirect Method of Proving Discrimination</u>

Under the indirect ("burden shifting") method of proof, the plaintiff carries "the initial burden under the statute of establishing a prima facie case of . . . discrimination." McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973). To establish a prima facie case of discrimination a plaintiff must offer evidence that: "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." Burks v. Wisconsin Dep't of Transportation, 464 F.3d 744, 750-51 (2006). "Once a prima facie case is established, a presumption of discrimination is triggered." Coleman v. Donahoe, 667 F.3d 835, 845 (7th Cir. 2012). The burden then shifts to the employer to articulate some "legitimate, nondiscriminatory reason" for its action. McDonnell Douglas, 411 U.S. at 802. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. Id. at 804.

Ms. Rogers's evidence would support a finding of racial discrimination under the

20

indirect proof method of analysis, because she can establish a prima facie case and Defendant has failed to articulate legitimate, non-discriminatory reasons for the disparate treatment.

<u>Plaintiff is a member of the relevant "protected class" and engaged in statutorily protected activity.</u>  Defendant acknowledges that Ms. Rogers satisfies the first element of a prima facie case of discrimination.

<u>Plaintiff met Defendant's legitimate expectations.</u>  Oddly, Defendant claims that Ms. Rogers has produced no evidence regarding the second element of the test -- that she was meeting its legitimate expectations -- but admits that, because of the nature of her claims, the second element is "immaterial."  Regardless, the fact that Ms. Rogers worked for the Casino Queen as a cocktail waitress for fourteen years before voluntarily resigning is enough to show that she was meeting its legitimate expectations for a cocktail waitress.[3]

<u>Plaintiff suffered adverse employment actions.</u>  Defendant argues that evidence of employment actions that do not result in loss of income or other financial benefits are not "material" and thus cannot sustain a claim of race discrimination.  That is not the law, <u>see, e.g.</u>, <u>Knox v. State of Indiana</u>, 93 F.3d 1327, 1334 (7th Cir. 1996) ("adverse actions come in many shapes and sizes") but, even if it was, the employment actions upon which Ms. Rogers bases her claims qualify.  Contrary to Defendant's claims, the disparate treatment to which it subjected Ms. Rogers did more than make her "unhappy."  It materially affected her financial well being and altered the terms and conditions of her employment.

---

[3] Furthermore, where a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner, the second prong of the McDonnell Douglas analysis essentially disappears. <u>Pantoja v. American NTN Bearing</u>, 495 F.3d 840, 846 (7th Cir. 2007).

Ms. Rogers testified that tips constituted a large part (over 50% on average) of her income.  The day-to-day reassignment away from her bidded area of the casino floor, which occurred several times a week during the relevant time period, significantly affected the tips she was able to earn.  She lost base pay and tips when she was denied the opportunity to complete her shift after arriving late for work (in contrast to white cocktail waitresses), and lost additional base pay and tips when she was suspended as a result of the "absence."  Even when discriminatory write-ups did not immediately result in lost income, pay, under Defendant's progressive discipline system those write-ups could result in a harsher penalty being assessed in some future situation.  In a final insult, Defendant prevented Ms. Rogers from working out her two weeks' notice, which cost her ten days of tips. These employment actions were both adverse and material.

Defendant treated similarly situated Caucasian employees more favorably.  Ms. Rogers presented evidence of specific situations in which white cocktail waitresses, including Kim Lay, Nicole Khoury, "Brandie" and others, received better treatment than her with respect to discipline and privileges.  She also presented evidence that, when she was moved out of her bidded section of the casino floor on an ad hoc basis, one or more white cocktail waitresses took over her more lucrative stations.

Defendant claims that Ms. Rogers has not shown that the employees who received more favorable treatment were "similarly situated."  Similarly situated employees "must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way."  Coleman, 667 F.3d at 846, quoting Filar v Board of Educ. Of City of Chicago, 526 F.3d 1054, 1061 (7th Cir. 2008).  In the usual case a plaintiff must at least

show that the comparators (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Coleman at 847, quoting Gates v. Caterpillar, Inc., 513 F.3d 680, 690 (7th Cir. 2008) and Snipes v. Illinois Dep't of Corrections, 291 F.3d 460, 463 (7th Cir. 2002).

Defendant's evidence establishes that, during the entire time relevant to this lawsuit, Kelly Carey was "responsible for scheduling and floor assignments for *all* Cocktail Waitresses employed by the Casino Queen" and "in charge of employee discipline for *all* Cocktail Waitresses employed by the Casino Queen" (Deft's Ex. B, para. 2, 3 (emphasis added)). Furthermore, the collective bargaining agreement between UNITE-HERE and the Casino Queen "govern[ed] the terms and conditions of employment of *all* Casino Queen Cocktail Waitresses" (Id., para 7). Finally, the conduct engaged in by Ms. Rogers's white comparators was not only similar but in most instances was, in every material respect, identical to her own conduct.[4] The employees to whom Ms. Rogers compares herself were indeed similarly situated.

The presumption of discrimination triggered by Plaintiff's prima facie case stands, because Defendant has failed to present legitimate, non-discriminatory reasons for the disparate treatment. Once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate *through the introduction of admissible evidence* its legitimate

---

[4]Nicole Khoury, like Ms. Rogers, arrived to work over two hours late. Kim Lay routinely did not get to her work station on time after clocking in, thus committing the same offense of which Defendant accused Ms. Rogers. "Brandie" was caught eating at her workstation on the same day Ms. Rogers received a reprimand for having food at her workstation. And so forth.

nondiscriminatory reason for treating the plaintiff differently from her counterparts. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 529 (1993). Argument of counsel is insufficient to put plaintiff to the test of the next phase, establishing pretext. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 n.9 (1981); Freeman v. Madison Metropolitan Sch. Dist., 231 F.3d 374, 379 (7th Cir. 2000).  Here, Defendant has not articulated, much less produced evidence of, legitimate non-discriminatory reasons for treating Ms. Rogers differently from similarly situated white cocktail waitresses.  Therefore, she is not put to the test of establishing pretext and summary judgment cannot be granted.

Nowhere in its Memorandum does Defendant articulate a reason for sending Ms. Rogers home and charging her with an absence (and then suspending her for absenteeism) when she came to work several hours after her shift started, whereas it not only allowed Nicole Khoury to work when she arrived similarly late, but actually called her to come in after she was a "no call no show."  It has not articulated a reason that Ms. Rogers was charged with a "tardy" for arriving at her work station three minutes late, but Kim Lay was late to her workstation at least 42 times in an eleven month period and nevertheless continued her employment.  It has not presented a reason why Ms. Rogers was denied an emergency personal day to attend her aunt's funeral but white cocktail waitress Michelle was granted an emergency day off to attend to a family matter.  It has not articulated a reason why it issued Ms. Rogers a write-up for eating at her work station, but when "Brandie" was caught eating she did not get a write-up.  It has not articulated a reason for not allowing Ms. Rogers to work out her two weeks after she gave notice of her resignation, as she had observed white cocktail waitresses do.

24

In an apparent attempt to sidestep its burden of producing legitimate, non-discriminatory reasons for treating Ms. Rogers differently than her white co-workers, Defendant claims that "It is impossible to individually address every single act that Plaintiff believes was an act of racial discrimination because Plaintiff believes that 'every time' she was ever written up at the Casino Queen during her entire 15 years of employment it was an act of racial discrimination."  See Memorandum in Support at p. 6.  Defendant cites pages 184-185 of Ms. Rogers's deposition as evidence of this supposed claim.  But what Ms. Rogers actually said was:

> Q:    Do you believe that every time you were written up for any violation, that it was an act of discrimination?
>
> A:    Yes, *when I was being wrote up and the white cocktail waitresses were not being wrote up and were doing the exact same thing.*

Ms. Rogers described, in her deposition and in her responses to Defendant's interrogatories, incidents in which she was written up and white cocktail waitresses who did the same thing were not.  Defendant knew what Ms. Rogers claimed the disparate treatment to be.  Its failure to meet her claims with legitimate, non-discriminatory explanations precludes summary judgment in its favor.

The description of the "Contingency Floor Plans" in the Affidavit of Kelly Carey (Deft's Ex. B) is of limited, if any, evidentiary value.  Neither Ms. Rogers and Ms. Alexander ever saw, much less approved, a "contingency floor plan" before they bid on their shifts in 2008, 2009 and early 2010 (the time period covered in this lawsuit.)  (Ex. 1, para. 21; Ex. 2, para. 18)  Ms. Rogers complained about being moved out of her assigned area on many

occasions, to Ms. Carey, Mr. Gramiglia, HR Director Betty Smith, and various supervisors. Yet no one ever told her that the moves were part of a pre-designated contingency plan, as they surely would have if that was in fact the case. (Ex.1, para. 22)  The signature sheet that purports to indicate the cocktail waitresses'"agreement" with the contingency floor plans (Deft's Ex. C-5) does not contain Ms. Roger's signature.   Furthermore, although the document is undated, it could not have been presented to the waitresses in August 2008, as Ms. Carey's Affidavit implies.  The sheet contains the name of Janel Williams, who was not hired until June 2009, and does not contain the names of Kimberly Gann or Amie Whiteside, both of whom were employed throughout 2008 and 2009.  (Ex.3)  In fact, Ms. Gann and Ms. Whiteside both left their employment in February 2010 (id.), which indicates that whatever it was that the waitresses were approving, it was presented to them sometime after that time. The evidence about the contingency floor plans therefore has no relevance to Ms. Rogers's claims about her experiences in 2008, 2009 and early 2010.  Ms. Rogers's prima facie case with respect to discriminatory floor reassignments, like that with respect to her other claims, stands unrebutted.

Even if Plaintiff was required to produce evidence of pretext, she has done so.  It is well established that evidence that employees outside of a plaintiff's racial group were treated differently under the same circumstances can serve not only to establish her prima facie case but also to establish pretext.  See, e.g., Coleman v. Donahoe, 667 F.3d 835, 853 (7th Cir. 2012) (evidence that managers did not enforce a rule evenhandedly discharges plaintiff's burden at the pretext stage.)

For this additional reason, Defendant is not entitled to summary judgment on Ms.

Roger's disparate treatment claim.

Defendant's Remaining Arguments

Defendant argues, without citing any caselaw or evidence, that it is entitled to summary judgment on Plaintiff's hostile work environment claim. Defendant's one sentence argument ignores Local Rule 7.1(e) ("any brief in support of a motion for summary judgment. . . shall contain citations to relevant legal authority and to the record. . .") and cannot be taken seriously.

Regarding Defendant's similarly skeletal argument in one of its motions in Riley-Jackson, Judge Reagan stated:

> With respect to Plaintiff's hostile environment claim, Defendant CQ asserts that Plaintiff Meadows has failed to specifically identify a pattern of racial epithets or slurs, the use of racial symbols, or a pattern of racial comments or any other race-based allegation of harassment. CQ appears to only recognize a claim based on overt acts of racism, such as hurling racial slurs.
>
> Title VII prohibits employers from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ...." 42 U.S.C. § 2000e-2(a)(1). In order to impose Title VII liability for a racially hostile workplace, a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. Mendenhall v. Mueller Streamline Co., 419 F.3d 686, 691 (7th Cir.2005) (citations omitted). . .
>
> Because CQ has not delved into the merits of a claim based on disparate conditions and privileges, the Court will offer only a cursory analysis. Plaintiff has alleged a laundry list of incidents that she witnessed, some of which happened to her, that sufficiently establish (objectively and subjectively) a pervasively hostile environment in terms of race, which served to humiliate Plaintiff and interfere with her work performance.

Riley-Jackson, Doc. 527 (denying summary judgment against cocktail waitress E'Twon Meadows.)

27

Like Ms Meadows, Ms. Rogers was subjected to and witnessed a "laundry list" of indignities against African American employees.  She also attended meetings in which other black cocktail waitresses made complaints similar to hers about being treated unfairly because of their race.  The unfair treatment she received, observed, and heard about was sufficient to establish, objectively and subjectively, a pervasively hostile environment based on race which served to humiliate her and interfere with her work performance.  See Ex. 1, para. 31-32.

Defendant argues it is entitled to summary judgment on Plaintiff's retaliation claim. Defendant concedes that Ms. Rogers engaged in statutorily protected activity when she filed her original EEOC charge and lawsuit, and her second Charge of Discrmination in 2010.  Her continuing "informal" complaints of racial discrimination to Kelly Carey, Dominic Gramaglia, Tom Monaghan, Betty Smith and others likewise constitute protected activity.

The same evidence that supports Ms. Rogers's race discrimination claim under the indirect method of proof also supports her retaliation claim.  Ms. Rogers her prima facie case with evidence that employees who did not complain about race discrimination (Kim Lay, etc.) were treated more favorably than she was.  Defendant has not given any legitimate, non-retaliatory explanation for the difference in treatment, so the presumption of retaliation that arises from the prima facie case stands. If additional evidence of retaliatory motive was needed, it exists in the form of, among other things, (1) Ms. Rogers testimony that Mr. Gramaglia accused her of insubordination and sent her home when she attempted to complain about discriminatory floor assignments, and (2) Betty Smith's observation, as Defendant's Human Resources Director, that Defendant retaliated against employees who complained

28

about race discrimination.

Defendant argues that Ms. Rogers failed to file a timely charge of discrimination. Defendant makes various arguments that portions of Ms. Rogers's Title VII claims should be dismissed because they occurred more than 300 days before she filed her charge of discrimination with the EEOC, because they occurred after she filed her charge, because they were not specifically raised in her charge and/or are not part of a "continuing violation.  The Court does not need to parse through Ms. Rogers's claims with calendar in hand, though, because Ms. Rogers has also asserted her race discrimination and retaliation claims pursuant to 42 U.S.C. §1981.  "The substantive standard sand methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under §1981. See Humphries v. CBOCS West, Inc., 474 F.3d 387, 403-04 (7th Cir. 2007); McGowan v. Deere & Co., 581 F.3d 575, 579 (7th Cir.2009).   Furthermore, the damages available to a successful plaintiff under §1981 are the same as those available under Title VII, except that §1981 damages are not subject to Title VII's caps on non-economic and punitive damages. 42 U.S.C. § 1981a(b)(4).   There is no requirement that a plaintiff file a charge of discrimination or exhaust any other administrative procedures before filing a lawsuit under §1981, Fane v. Locke Reynolds, LLP, 480 F.3d 534, 539 (7th Cir. 2007), and the statute of limitations is four years.  Jones v. R. R. Donnelly & Sons Co., 541 U.S. 369, 382 (2004); Dandy v. United Parcel Service, Inc., 388 F.3d 263, 269 (7th Cir. 2004).

Ms. Rogers bases her claims on incidents that occurred between October 11, 2007 and May 20, 2010, all within four years before she filed this lawsuit on November 16, 2010. Accordingly, the question of whether any, some, or even all of Ms. Rogers's Title VII claims

are barred by her alleged failure to file a timely charge of discrimination is moot.  She can present all of her claims to a jury pursuant to §1981.

Defendant argues that Ms. Rogers's claims are barred by the doctrine of res judicata. This argument was addressed and disposed of in the Court's Order on Defendant's Motion to Dismiss (Doc.21).  The Court ruled that Ms. Rogers's and Ms. Alexander's claims based on factual events that occurred after they filed their original lawsuit are not barred by res judicata, because they constitute a different transaction or transactions.

Defendant argues that Plaintiff has not in every instance proven that white cocktail waitresses were not disciplined in the same way.  But a jury could draw one of several reasonable inferences from Ms. Rogers's evidence that certain white cocktail waitresses were repeat offenders (e.g., Ms. Lay, who was late to her work station 42 times in eleven months, Ms. Piatt who ate food at her work station three times in one month.)  (1) Management did not notice the white waitresses' repeat infractions because it was not scrutinizing their behavior to the same extent it was Ms. Rogers's; (2) Management noticed the infractions but did not discipline the white waitresses, because if they had been disciplined the waitresses would have corrected their behavior; or (3) Management observed the infractions and disciplined the white waitresses, but when they flaunted the discipline by continuing to transgress, Management nevertheless did not remove them from the workplace.  Any of these conclusions supports Ms. Rogers's claims of racial discrimination.

Defendant argues that Plaintiff could have addressed her race discrimination claims through her union's grievance process or a "guaranteed fair treatment" hearing.  It is well established that when an employee has both a contractual right by virtue of a collective

bargaining agreement and a statutory right to be free from discrimination, "both rights have legally independent origins and are equally available to the aggrieved employee." See Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 (1974) and its progeny.  Furthermore, as Human Resources Director Betty Smith testified, Defendant's internal complaint procedures were anything but "fair."

Defendant argues that it has a diverse work force.  Of the cocktail waitresses who were actively employed between October 2007 and May 2010, only seven out of 31, or 22.5%, were African American, despite Defendants location in a predominately African American community.  (Ex.3)  Betty Smith testified that Defendant disproportionately relegated African American employees to "back of the house" jobs, while favoring white employees for positions, such as cocktail waitress, that had significant customer contact. (Riley-Jackson, Doc. 117, p. 322-323)  Even if African Americans in general were well-represented and well-treated among Defendant's work force (and the evidence is they weren't), "Congress never intended to give an employer license to discriminate against some employees on the basis of race. . . merely because he favorably treats other members of the employee's group." Diaz, 653 F.3d 582, 588, quoting Connecticut v. Teal, 457 U.S. 440, 455 (1982).

Defendant characterizes Ms. Rogers's testimony as "self-serving" and implies that it has little, if any, evidentiary value.  Judge Reagan repeatedly chided Defendant for making such claims with respect to the plaintiffs' testimony in Riley-Jackson, pointing out that "while uncorroborated self-serving testimony cannot support a claim. . . based on speculation, intuition or rumor or a claim that is inherently implausible, testimony based on

first-hand experience (including a plaintiff's own deposition testimony) is completely acceptable."  See, e.g., Riley-Jackson, Doc. 539 at p. 8 (citing Darchak v. City of Chicago Board of Education, 580 F.3d 622, 631 (7th Cir. 2009)).

Defendant mocks Plaintiff for testifying that African American employees might have participated in discriminating or retaliating against her.  But there are many reasons why an African American might participate in such conduct.  Perhaps he or she is merely being used as a "front" for decisions made by others, as Betty Smith testified was the case with the African American members of the Guaranteed Fair Treatment committee.  Perhaps the employer has engendered such a pervasive atmosphere of discrimination that the employee is resigned to it. Or perhaps, as Ms. Rogers testified with respect to Human Resources representative Ida Danley, "I think Ida feared for her job."  (Deft's Ex. A, p. 220).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

/s/ *Kathryn E. Denner*
Kathryn E. Denner
Mo. Bar. No. 40260
230 S. Bemiston Ave., Suite 800
St. Louis, MO 63105
(314) 872-8420
(314) 872-7017 FAX
Katedenner@denner-law.com

Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

The undersigned certifies that on June 8, 2012 the foregoing was filed electronically and was served via the Court's electronic filing system on the attorneys of record in this matter.

_/s/ Kathryn E. Denner_