IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS


| | | |
|---|---|---|
| STACY ALEXANDER and<br>KIM ROGERS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 10-CV-908-WDS |
| CASINO QUEEN, INC., | ) ) | |
| Defendant. | ) | |


## MEMORANDUM & ORDER

**STIEHL, District Judge:**

### I. INTRODUCTION

Before the Court are defendant Casino Queen, Inc.'s motions for summary judgment as to each plaintiff, Stacy Alexander and Kim Rogers (Docs. 37, 38). Plaintiffs are claiming race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981 (Doc. 5). They have responded to defendant's motions (Docs. 50, 51), and defendant has replied (Docs. 54, 55). Plaintiffs subsequently filed a motion to strike defendant's reply briefs (Docs. 56, 57), to which defendant responded (Doc. 58) and plaintiffs have replied (Doc. 62).


### II. BACKGROUND

Plaintiffs Stacy Alexander and Kim Rogers are former cocktail waitresses at a casino in East St. Louis, Illinois, operated by defendant Casino Queen, Inc. They are both African-Americans. Alexander began her employment in 1993, Rogers in 1994. The Court

1

previously granted in part defendant's motion to dismiss, limiting plaintiffs' claims in this action to events that have taken place since October 11, 2007 (Doc. 21).

*A. Write-ups and disciplinary issues*

Kelly Carey was the Food and Beverage Manager. She was responsible for any discipline of all cocktail waitresses at the Casino Queen. Above Carey was Dominic Gramaglia, the Food and Beverage Director.

On February 8, April 24, and December 7, 2008, Kelly Carey wrote Alexander up for spending "excessive" time at the bar (Doc. 50, Ex. 2, ¶ 3). Alexander "observed and was told about white cocktail waitresses who spent as much or longer periods of time at the bar, or chatting with each other or with other employees rather than serving customers, but were not written up" (*id.*, ¶ 3). Rogers observed "many occasions" in which white cocktail waitresses stood at the bar chatting with each other or with white bartenders for extended periods of time (*id.*, Ex. 1, ¶ 10). On November 17, 2009, Kim Lay, a white waitress, spent an hour on the casino floor talking to another employee (*id.*). Carey passed them twice before finally saying something to them (*id.*).[1] In her deposition, Alexander mentions four white employees by name, but admitted that she has never asked them whether they had been written up for spending too much time at the bar (Doc. 37, Ex. 1, 166:7–10). She never asked Carey whether she had written the employees up either (*id.*, 166:11–14).

On October 3 and November 3, 2008, Alexander was written up for being tardy, even though she was not (Doc. 50, Ex. 2, ¶ 4). On November 8, she was written up for arriving late two days before, even though time records showed she had only been one minute late (*id.*). She was then suspended for a day for having too many tardies.

---

[1] Rogers's response brief asserts that Lay's personnel file does not indicate a write-up for that date (Doc. 50, p. 4). That allegation of fact is not in the record and will be not be considered. *See* SDIL-LR 7.1(d) ("Allegations of fact not supported by citation may, in the Court's discretion, not be considered.").

Alexander saw Kim Lay arrive late often enough that she should have been terminated under a rule that employees were only allowed nine tardies in one year. Lay was not terminated (*id.*). Rogers counted that Lay arrived late 42 times between December 23, 2008, and November 11, 2009, yet Lay was still employed when Rogers left in May 2010 (*id.*, Ex. 1, ¶ 5). She even saw Lay arrive five minutes late on November 11, 2009, and asserts that Carey saw it because she and Carey were both standing at the bar at the time (*id.*, ¶ 6).[2] Rogers has never seen a white waitress's personnel files, however (Doc. 38, Ex. 1, 185:10–186:1). She admits that if Lay had been written up, she would not necessarily have known it (*id.*).

On February 16 and 24, 2008, Alexander was written up for absences while she was on leave under the Family and Medical Leave Act (Doc. 50, Ex. 2, ¶ 5). Later, when Alexander had a family emergency in October 2008 and wasn't able to call in before her shift started, Carey suspended and then fired her, using both that absence and the two absences from February (*id.*). Alexander was able to grieve the incident with her union. She was reinstated and recovered her base pay for the seven days she missed, but not for the tips she would have made (*id.*).

On April 7, 2009, Rogers overslept and was about two and a half hours late to work. Carey sent her home without letting her finish her shift (*id.*, Ex. 1, ¶ 13).[3] She was not given a suspension for the April 7 absence (Doc. 38, Ex. 1, 85:10–12).

By contrast, on May 29, 2009, Nicole Khoury, a white cocktail waitress did not show up for work or call in.[4] But an unnamed cocktail waitress, as well as the Food and Beverage Director, Gramaglia, told Rogers that someone in defendant's organization had

---

[2] What Carey saw or didn't see is not within Rogers's personal knowledge.

[3] In her response brief and affidavit, Rogers says she was charged with an absence and given a one-day suspension (Doc. 50, Ex. 1, ¶ 13). She says she lost pay and tips from the suspension, and also was denied a bonus in 2009 due to the suspension (*id.*). These assertions contradict her deposition testimony, however, in which she said she was not suspended for the April 7 absence (Doc. 38, Ex. 1, 85:10–12, 87:12–17).

[4] In her affidavit, Rogers says Khoury should have been terminated (Doc. 50, Ex. 1, ¶ 14). However, she said in her deposition she was not sure why she thought termination would have been the penalty (Doc. 38, Ex. 1, 82:8–13).

called Khoury to get her to come in to work and, when she arrived, allowed her to work the rest of her shift (*id.*). Gramaglia told Rogers it should not have happened. Rogers does not know whether Khoury was disciplined (Doc. 38, Ex. 1, 83:22–24).

On June 18, 2009, Alexander called in to say she would be late for work. She arrived less than two hours late (Doc. 50, Ex. 2, ¶ 7). Carey sent her home for being late, even though white waitresses with less seniority were working at the time and not sent home. Alexander was given an absence and suspended for one day (*id.*). She filed a grievance and was reimbursed her base pay for both days but was not reimbursed for lost tips (*id.*). On July 13, 2009, however, Kim Lay was over an hour late to work but was allowed to stay and complete her shift (*id.*, ¶ 8).

On December 21, 2008, and again in April 2009, Carey wrote Alexander up for stopping at the restroom after lunch, before returning to the floor (*id.*, ¶ 6). Alexander claims she saw white cocktail waitresses do the same thing repeatedly (*id.*). In August 2009, Alexander was written up and suspended for absences again when she was supposed to be on FMLA leave (*id.*, ¶ 9).

On May 20, 2010, Rogers gave her two weeks' notice. A Human Resources representative called Rogers and told her not to come back to work. Rogers asked if she could revoke her notice so she could work the last two weeks, but was told no. She received her base pay for the two weeks but, of course, did not earn any tips (*id.*, Ex. 1, ¶ 25). Yet Rogers had seen white cocktail waitresses Kim Turner, "Brandie," Kim Gann, and others announce their resignations and continue working for their last two weeks.

*B. Floor assignments*

Waitresses were assigned to specific areas of the casino floor, for instance to the slot machines or the gaming tables. Some areas were more lucrative for the waitresses because the customers there tipped better. For example, the area around the "high roller" ta-

bles was desirable because the average tips were higher, while the area around the penny slots was not (Doc. 50, Ex. 1, ¶ 15). And tips were a large part of the waitresses' income (*id.*, Ex. 2, ¶ 11). Their base pay was between $7–8 per hour (about $60 per day). Depending on the area of the floor they were assigned to, tips could be from $75 to $150 or more per day for Alexander and $40 to $160 for Rogers (*id.*, ¶ 11; *id.*, Ex. 1, ¶ 16).

Cocktail waitresses periodically bid for areas of the floor (their shift assignments) based on seniority (*id.*, Ex. 1, ¶ 17). When a waitress was absent, though, the remaining waitresses were given a new floor assignment for the day to cover the absent waitress's area (*id.*, ¶ 19). By 2008, plaintiffs were both senior waitresses and could bid on and receive the areas that had "good potential for tips" (*id.*, ¶ 18; *id.*, Ex. 2, ¶ 13). But when new floor assignments were given to cover for absent waitresses, plaintiffs were "almost always," which they estimate was several times each week, moved from their assigned area to a less desirable area (*id.*, Ex. 2, ¶ 15). White waitresses were then assigned to cover desirable parts of plaintiffs' areas (*id.*). The new floor assignments caused plaintiffs to earn less in tips (*id.*). Three days in July 2009, for instance, Alexander was removed from her lucrative table-game area and assigned to cover elsewhere, while a white waitress was given her table-game area (*id.*, ¶ 16).

A separate incident occurred in late 2008 or early 2009. Alexander bid on and received an area containing the dollar slot machines, a good area for tips (*id.*, Ex. 2, ¶ 14). Several months later, however, the assigned areas were reconfigured, and the dollar slots were removed from Alexander's area (*id.*). They were moved to an area assigned to a white waitress (*id.*). Although she says in her affidavit that no rebid was conducted, (*id.*), she stated in deposition testimony previously that she was allowed to bid on a new area (the dice pits), and that rebid resolved her problem with the removal of the dollar slot machines (Doc. 37, Ex. 1, 218:8–219:18). Alexander also acknowledged that Carey was not responsible for moving the games (*id.*, 220:10–11). The "gaming guys" were, and she does

not believe they were discriminating against her (*id.*, 220:10–20). She agreed that Carey could not actually control when the gaming guys decide to move slot machines (*id.*, 220:20–22). Alexander's affidavit explains further, "I do not mean the dollar slot machines were physically moved. I mean that the boundaries of my assigned area were changed so it no longer included them" (Doc. 50, Ex. 2, ¶ 14).[5]

Rogers complained frequently to Carey about how she was treated, which she believed was because of her race. She filed several race-discrimination complaints with Human Resources. She complained to Gramaglia several times about the day-to-day reassignments from her assigned area and that it caused her to earn less in tips. On one occasion when she confronted him, he told her she was being insubordinate and sent her home before her shift was over (*id.*, Ex. 1, ¶ 28).

### III. Motion to Strike

Plaintiff's motion to strike (Docs. 56, 57) centers on the substance of defendant's reply briefs. Defendant says the only evidence plaintiffs provide in response to its motions for summary judgment are (1) their own affidavits, which defendant characterizes as self-serving, unnotarized statements, and (2) depositions taken in another case, *Riley-Jackson v. Casino Queen, Inc.*, Case No. 07-cv-0631-MJR-PMF (S.D. Ill. May 31, 2011). Although defendant calls its filings *reply* briefs, defendant is in fact moving the Court to strike plaintiffs' affidavits and deposition testimony.

As to the affidavits, defendant argues they do not comply with Federal Rule of Civil Procedure 56(c)(4), which provides that affidavits used to oppose a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See also Jajeh v.*

---

[5] Alexander's response brief says that when she lost her dollar slots and when she was reassigned to less lucrative areas on an ad hoc basis, it had a "significant effect on her income" (Doc. 51, pp. 6–7). That allegation of fact is not supported in Alexander's affidavit (*see* Doc. 50, Ex. 2, ¶ 11). The Court will therefore not consider it. *See* SDIL-LR 7.1(d).

*Cnty. of Cook*, 678 F.3d 560, 568 (7th Cir. 2012). Plaintiffs do not respond to this argument. The difficulty with defendant's briefs on this issue, though, is that they are simply a memorandum of law without reference to the plaintiffs' allegations of fact in the affidavits. It cannot be said that *all* plaintiffs' allegations are not made on personal knowledge (*e.g.*, "I received a write-up for being tardy on November 3, 2008" (Doc. 50, Ex. 1, ¶ 4)). The Court will therefore not strike the affidavits and will address plaintiffs' allegations in the course of resolving defendants' summary-judgment motions.

Defendant also moves that the Court either strike or ignore plaintiffs' citations to deposition testimony taken in the *Riley-Jackson* case. The Federal Rules of Civil Procedure state:

> "A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action. A deposition previously taken may also be used as allowed by the Federal Rules of Evidence.

Fed. R. Civ. P. 32(a)(8). Defendant therefore says the depositions are not admissible because they are not "between the same parties." In similar circumstances, the Seventh Circuit agreed with the district court's exclusion of deposition testimony taken in an earlier action:

> Many of the attachments were pages of depositions taken in other actions, which could be used if the other actions were "between the same parties or their representatives or successors in interest", Fed.R.Civ.P. 32(a)(4), a condition that does not appear to have been met. (We use the qualifier "appear" because the lawyer did not make any effort to show the relation among the parties to the different cases.)

*Nw. Nat. Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994). Plaintiffs do not suggest the deposition testimony involves the same subject matter "between the same parties, or their representatives or successors in interest." Rather, they believe the court of appeals in *Bal-*

7

*tes* merely held that depositions from another case *can* be used if the prior action was between the same parties, "but nowhere does the case say that it can *only* be used if the parties in the prior action were the same" (Doc. 57, p. 2). Yet *Baltes* held that the depositions were properly excluded. And, as in *Baltes*, plaintiffs here do not make any effort to show the relation among the parties to the different cases.

Plaintiffs move to strike defendant's reply (Docs. 56, 57). They argue that the depositions are admissible under Rule 32(a)(8), which they quote as follows: "[a] deposition previously taken [in another case] may also be used as allowed by the Federal Rules of Evidence" (Doc. 57, p. 2). They assert that Federal Rule of Evidence 804(b)(1) allows the admission of deposition testimony from another case where the parties are not the same so long as the party against whom the deposition is offered (or its predecessor in interest) had an adequate opportunity and motive to develop the witness's testimony through direct or cross examination. They further maintain that courts routinely admit such deposition testimony, citing *Ross v. Black & Decker*, 977 F.2d 1178, 1186 (7th Cir. 2003). But Rule 804(b)(1) applies to hearsay testimony when the declarant is unavailable as a witness. Fed. R. Evid. 804; *Ross*, 977 F.2d at 1186; *United States v. Sklena*, --- F.3d ----, No. 11-2589, 2012 WL 3608583, at *5 (7th Cir. Aug. 23, 2012). Plaintiffs do not show that any of the deponents from *Riley-Jackson* are unavailable. It is their burden to do so. *See* Michael H. Graham, 30C Fed. Prac. & Proc. Evid. § 7072 (2d ed.) (citing *United States v. McGowan*, 590 F.3d 446, 453–54 (7th Cir. 2009)). In a footnote, they make the specious claim that all witnesses are "unavailable" on a motion for summary judgment since live testimony is not taken. That is not the meaning of unavailable; it is defined in the rule itself. *See* Fed. R. Evid. 804(a); *United States v. Donaldson*, 978 F.2d 381, 392 (7th Cir. 1992) (unavailability is defined by Fed. R. Evid. 804(a).).

Finally, plaintiffs assert that defendant's arguments are made in bad faith because defendant itself used some deposition testimony from *Riley-Jackson* in its motions for

summary judgment. Plaintiffs claim defendant should be estopped from attempting to have it both ways. This is reason to strike all the deposition testimony, however, not a reason to allow it. Plaintiffs contend that defendant's use of the deposition testimony has potentially prejudiced them because, not believing it necessary, they did not bother to argue why the testimony should be admitted. They therefore ask for leave to file a sur-reply brief if the Court chooses not to strike defendant's reply briefs. But it was plaintiffs' burden to establish the admissibility of the testimony whether defendant used similar testimony or not. The Court notes, in passing, that defendant's use of similar testimony was quite minor and not relevant to the issues in this case anyway. Moreover, instead of a sur-reply brief, plaintiffs have filed a motion to strike, a memorandum in support, and a reply brief all discussing the admissibility of the depositions; even if plaintiffs were lulled into complacency by defendant's minor use of similar testimony, they have had ample opportunity to refute defendant's arguments. The Court concludes that the deposition testimony from *Riley-Jackson*, including those portions cited by defendant, will not be considered. Plaintiffs' motion to strike (Docs. 56, 57) is **DENIED**.


## IV. DISCUSSION

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 646 (7th Cir. 2011); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

In response to a motion for summary judgment, the nonmoving party "'must do more than raise some metaphysical doubt as to the material facts; [it] must come forward with specific facts showing that there is some genuine issue for trial.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quoting *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006)). A genuine issue for trial exists "only if suffi-

cient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Argyropoulos*, 539 F.3d at 732 (quoting *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007)); *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007).

In deciding the motion, the court must construe all facts and reasonable inferences in favor of the nonmoving party. *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006). Reasonable inferences do not include those "supported only by speculation or conjecture." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). The court may not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## V. ANALYSIS

Plaintiffs bring their claims under both Title VII and § 1981. Claims under both laws, including retaliation claims, are generally evaluated the same way. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007) ("[W]e generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981."); *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001). Title VII forbids an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff who sues an employer under Title VII bears the burden of proving discrimination.

The plaintiff can prove discrimination under Title VII by presenting evidence of discrimination (the "direct method") or by the *McDonnell Douglas* burden-shifting approach (the "indirect method"). *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 586–87 (7th Cir. 2011); *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). Plaintiffs here are proceeding under both methods. Both require the plaintiff to show that

10

she experienced a materially adverse employment action. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *accord Lewis v. City of Chi.*, 496 F.3d 645, 652–53 (7th Cir. 2007). Plaintiffs claim retaliation, too, which also requires an adverse employment action. *E.g.*, *Rennie v. Dalton*, 3 F.3d 1100, 1109 (7th Cir.1993) (noting that a claim of retaliation requires (1) that the plaintiff engaged in statutorily protected activity, (2) suffered adverse employment action, and (3) can show a causal link between the protected activity and the adverse employment action). The Court will therefore evaluate plaintiffs' claimed adverse employment actions first.

*A. Adverse employment actions*

For purposes of Title VII, an adverse employment action is one that affects the "compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a), such as hiring, firing, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits, *see Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000). "'Although we define adverse employment action broadly, not everything that makes an employee unhappy is an actionable adverse action. For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits.'" *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)). Adverse employment actions can be categorized into three types:

> (1) the employee's current wealth such as compensation, fringe benefits, and financial terms of employment including termination;
> (2) the employee's career prospects thus impacting the employee's future wealth; and
> (3) changes to the employee's work conditions including subjecting her to "humiliating, degrading, unsafe, unhealthy,

11

> or otherwise significant negative alteration in [her] work
> place environment."

*Lewis*, 496 F.3d at 653 (quoting *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th

Cir. 2002)); *Barton v. Zimmer, Inc.*, 662 F.3d 448, 454 (7th Cir. 2011).

Plaintiffs claim six instances of adverse employment actions that materially affect-

ed their financial well-being and altered the terms and conditions of their employment:

> (1) Plaintiffs were reassigned several times per week from
> their bidded areas of the casino floor,
> (2) The dollar slots were removed from Alexander's area
> outside the regular bidding procedure, which significantly af-
> fected the tips she could earn,
> (3) When plaintiffs arrived late for work, they were sent
> home and not allowed to complete their shifts,
> (4) Alexander was suspended and fired even though she had
> been on medical leave,
> (5) The discriminatory write-ups made against them could
> result in a harsher penalty in the future under defendant's
> progressive discipline system (even though the write-ups did
> not immediately result in lost income), and
> (6) When Rogers gave her two weeks' notice, she was not
> permitted to work the remaining two weeks.

Plaintiffs list these six instances in one paragraph of their response briefs without

citation or legal argument, so it is not completely clear which events in the record they are

referring to. Their legal argument for all six is that adverse employment actions "can come

in many shapes and sizes," *Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996), and

therefore adverse employment actions need not necessarily result in the loss of income or

other financial benefits. *See also Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.

1996) (noting that "adverse employment action" is defined broadly in this circuit). True,

but they still must show that the particular incidents they experienced *were* adverse em-

ployment actions. If the incidents did not result in loss of income, they need to have affect-

ed plaintiffs' career prospects (impacting their future wealth), or their work conditions

(such as subjecting them to humiliation). *See Lewis*, 496 F.3d at 653. Plaintiffs do not ar-

gue either of those things. So loss of income is the only basis left. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) ("Typically, adverse employment actions are economic injuries.").

Incident (1) claims that plaintiffs were reassigned several times per week from their bidded areas of the casino floor to cover other areas when waitresses were absent. Plaintiffs were both senior waitresses who could bid on and receive the areas that had "good potential for tips." But when new floor assignments were given to cover for absent waitresses, plaintiffs were "almost always" moved from their assigned areas to less desirable areas, while white waitresses were assigned to cover plaintiffs' areas. Three days in July 2009, for instance, Alexander was moved from her lucrative table-game area and assigned to cover elsewhere while a white waitress was given her table-game area. Plaintiffs believe these reasssignments caused them to earn less in tips. How much less they earned is not in the record.

Defendant makes three points in its motion for summary judgment. Plaintiffs do not respond to any of them. Defendant first argues that these reassignments do not constitute an adverse employment action because they were mere changes in shift, with the same job title and responsibilities. *See Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) (change in working hours without a change in pay, job title, or responsibilities not an adverse employment action); *see also O'Neal v. City of Chi.*, 392 F.3d 909, 913 (7th Cir. 2004) (same for a lateral job transfer accompanied only by "ordinary difficulties"); *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (same for change of shift, lengthened commute, unfair discipline, substituting "a favorable evaluation for a more favorable one," letters of warning, giving more difficult work, giving work outside normal job responsibilities, refusing leave requests when work was backlogged, and temporarily denying a parking permit). Yet plaintiffs' claim centers on a loss in tips, and the cases cited do not address that. Second, defendant implies that tips are a discretionary monetary benefit, and the

loss or denial of a discretionary benefit, *i.e.*, a benefit that is within the discretion of the employer to grant or deny, is not an adverse employment action. *See Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001); *see also Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996) (loss of a bonus that employee was not entitled to is not an adverse employment action). But that rule does not apply to components of an employee's salary, *Tyler*, 245 F.3d at 972, and tips would seem to be a component of a waitress's salary. They are not within the employer's discretion to grant or deny. Defendant's third point is that plaintiffs do not offer evidence in support of their claim. The Court agrees. Not only do plaintiffs fail to respond to defendant's arguments, they do not indicate how much in tips they lost. They give their average earnings in tips overall, but they do not say how much less they made on a typical day when they were reassigned. Moreover, their bidded areas only gave them a "good potential for tips." Since it was only a potential, the assertion that they earned less when they were reassigned is speculative. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). Plaintiffs do not meet their burden to show a decision regarding reassignments that caused them a *significant* change in benefits. *See Lewis*, 496 F.3d at 653.

In incident (2), Alexander says the dollar slot machines were permanently removed from her area outside the regular bidding procedure, and that it "significantly affected the tips she was able to earn" (Doc. 51, p. 20). She says the dollar slot machines were a "good area for tips." Defendant responds that Alexander has not shown how the removal of the machines materially affected the terms or conditions of her employment, adding that her allegation that the floor placement of waitresses and machines affected tips has not been established with admissible evidence. The Court agrees with defendant that Alexander has not established that removal of the dollar slot machines amounts to an adverse employment action. Alexander does not offer any evidence of how much she lost when the dollar slots were removed from her area. She only says it was a "good area for tips," nothing more.

14

Her assertion that it "significantly affected the tips she was able to earn" only appears in her response brief, without citation to "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also* SDIL-LR 7.1(d). Alexander says, in general, that tips were a large part of her income and estimates that tips could be from $75 to $150 or more per day. She does not, however, relate that estimate to tipping in different areas of the casino floor. More specifically, she does not say how much she was earning in tips before and after the dollar slot machines were removed. The assertion in her response brief that the machines were permanently removed cannot be true because the waitresses *periodically* bid for areas of the floor. In addition, her assertion that the area was not rebid is not completely true. In her deposition, she says that sometime later she bid on a new area, which resolved her problem with the removal of the dollar slot machines (Doc. 51, Ex. 1, p. 218:8–219:18).[6] *See Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987) ("[A] party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony."); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861–862 (7th Cir. 1985). Thus the Court concludes that Alexander has not shown that the moving of the slot machines was a decision causing a significant change in benefits.

In incident (3), both plaintiffs say that when they arrived late for work, they were sent home without the opportunity to complete their shifts. Alexander was suspended for an additional day. This appears to refer to June 18, 2009, when, according to Alexander's affidavit, she had called in and arrived less than two hours late, but Carey sent her home.[7] Alexander was then given an absence and suspended for one day. She filed a grievance,

---

[6] This fact is not cited by defendant, but the Court may consider it. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it *may* consider other materials in the record." (emphasis added)).

[7] In her deposition, Alexander says she does not remember how late she was, but it was less than four hours. She says Carey sent her home because business was slow. She conceded that managers have discretion to send employees home when business is slow (Doc. 37, Ex. 1, 210:2–20). Alexander's affidavit filed in response to defendant's summary-judgment motion says she was less than two hours late and that she was sent home "because [she] had been late" (Doc. 50, Ex. 2, ¶ 7).

however, and was reimbursed her base pay for both days (*id.*).[8] She was not reimbursed for her lost tips (*id.*).[9] There is no evidence in the record showing how much she lost in tips, or may have lost, on those two days. Similarly, Rogers overslept on April 7, 2009, and arrived about two and a half hours late. Carey sent her home, causing her to lose pay and tips for the day. Rogers's affidavit asserts that she was suspended and lost a bonus due to the suspension, but that is not consistent with her deposition; she said she was not suspended.

In reference to Alexander's suspension, defendant argues that a suspension that is never served, or that is overturned with no loss in pay or benefits, is not an adverse employment action. *See Gibbs v. Gen. Motors Corp.*, 104 Fed. App'x 580, 582 (7th Cir. 2004) (no adverse employment action where employer rescinded the suspension within 24 hours with no loss of pay or benefits); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009) (no adverse employment action where suspension was never served). Alexander does not cite any legal authority that would suggest an overturned suspension resulting in the loss of a waiter or waitress's tips for less than two days amounts to an adverse employment action. In *Whittaker v. Northern Illinois University*, the Seventh Circuit observed that adverse employment actions are typically economic injuries, so a three-day suspension without pay would qualify—but the suspension was not served. Since it was not served, it had no economic effect on the plaintiff and could not constitute an adverse employment action. 424 F.3d 640, 647 (7th Cir. 2005). Neither party addresses the precise issue here: Whether a short suspension, served but overturned, that only results in a loss of tips can be an adverse employment action. The Court can estimate that Alexander lost at most $150 for the one full day and perhaps half that, $75, for the day she was late. But it is Alexander's burden to show she suffered an economic injury and to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[8] Q: "But you talked to the union and you got that overturned, right?" A: "Yes" (Doc. 37, Ex. 1, 211:13–15).
[9] In her response brief, Alexander claims she lost both her base pay and tips, but neither her affidavit nor her deposition say she lost base pay, so base pay not an issue (Doc. 50, Ex. 2, ¶ 7).

250 (1986); *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 496 (7th Cir. 2011); Fed. R. Civ. P. 56(e). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249; *see also Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (the court relies on the non-moving party to identify the evidence which creates an issue of triable fact). The Court does not find that Alexander's sole statement in the record, in her affidavit in response to defendant's motion, that she "lost the tips [she] would have earned" establishes her economic injury with sufficient evidence for a jury to return a verdict for her. There is not evidence of a significant change in benefits. *See Lewis*, 496 F.3d at 653.

As to Rogers, there is the discrepancy between her deposition testimony and the affidavit she filed with her response. First there was no suspension, then there was. The Court may not make credibility determinations or weigh conflicting evidence, but Rogers cannot create a genuine dispute as to material fact by contradicting her deposition testimony with an otherwise unsupported affidavit, *see Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861–862 (7th Cir. 1985). The allegation of a suspension (and the lost bonus arising from it) will not be considered. Therefore, Rogers may only assert her lost her pay and tips from the partial day when she was late and sent home. She does not cite any legal authority suggesting this incident amounts to an adverse employment action, however. Since she does not support her argument with citations to relevant legal authority, the Court finds that Rogers has waived it. *See* SDIL-LR 7.1(d). Also, defendant notes that the purpose of the adverse-employment-action requirement is "to provide a reasonable limiting principle for the type of conduct actionable under the statute," *Phelan v. Cook Cnty.*, 463 F.3d 773, 780 (7th Cir. 2006). Even if Rogers had not waived this argument, the Court does not find that a partial lost day of work constitutes an adverse employment action.

In incident (4), Alexander says she was suspended and fired even though she was

on medical leave (Doc. 51, p. 20). This appears to refer to her termination in October 2008. On February 16 and 24, 2008, Alexander was written up for absences while she was on leave under the Family and Medical Leave Act (Doc. 50, Ex. 2, ¶ 5). She complained about it and thought the absences had been removed (*id.*). But months later, in October, she had a family emergency and wasn't able to call in before her shift started. Carey then used the two February absences and the October incident to suspend and fire Alexander (*id.*). Afterwards Alexander was able to grieve the incident with her union and get herself reinstated with her base pay for the seven days she missed. But when she was deposed by defendant, the following exchange about this incident took place:

> A: Kelly [Carey] didn't really understand, so when I had the emergency with my daughter, they used the three and terminated me, and I got the union involved, and everything was cleared up on that one.
> Q: All of it got taken care of, right?
> A: Yes.
> Q: You used the grievance procedure; they threw out your suspension and your termination?
> A: Yes.

(Doc. 37, Ex. 1, 205:6–15). Defendant argues that Alexander's suspension and termination were overturned by the Grievance Board and, as before, observes that a suspension that is never served, or that is overturned with no loss in pay or benefits, is not an adverse employment action. *See, e.g.*, *Whittaker*, 424 F.3d at 647. But in her affidavit filed with her response, Alexander says she did not recover the tips she would have made during those days (*id.*). Her response brief adds that tips constituted a large part of her income (Doc. 51, p. 20). So defendant's reply argues that Alexander is introducing facts without evidentiary support. It also argues that parties cannot thwart the purposes of Rule 56 by creating "sham" issues of fact with affidavits that contradict their prior depositions. *See, e.g.*, *Diliberti*, 817 F.2d at 1263.

     The Court finds that, as with Alexander's incident (3) regarding her suspension, her

general allegation in her affidavit of lost tips does not set forth specific facts showing that there is a genuine issue for trial. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (noting that a self-serving affidavit may be part of the record if it "meets the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial." (quoting *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003)). But even assuming it does, the new assertion in her affidavit that she lost tips—and more importantly the claim in her response brief that it constitutes an adverse employment action— contradicts her earlier deposition testimony that "everything was cleared up." In the same testimony, defendant's counsel confirmed with Alexander that "all of it" had been taken care of, and she agreed. She should not be permitted to sandbag defendant with the new claim that she lost tips and that those lost tips constituted an adverse employment action. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 687–88 (7th Cir. 2008) ("Although the affidavit statement does not necessarily conflict with [the plaintiff's] testimony from her previous deposition, the *omission* of such a significant statement during her deposition in a sex discrimination case speaks volumes."). Her claim might be admissible if it were newly discovered evidence or offered to clarify a prior ambiguous statement, *see Gates*, 513 F.3d at 688 n.5 (citing *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1996)), but that is not the case. If the Court were to allow Alexander's claim of lost tips, "the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut." *Babrocky*, 773 F.2d at 861; *Gates*, 513 F.3d at 688; *see also Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1996) ("The concern in litigation, of course, is that a party will first admit no knowledge of a fact but will later come up with a specific recollection that would override the earlier admission."). Accordingly, the Court finds that Alexander's incident (4) about her suspension and termination in October 2008 does not constitute an adverse employment action.

Incident (5) does not qualify as an adverse employment action. It is not enough to say the write-ups could or might result in a penalty; plaintiffs must show that the write-ups resulted in some other negative consequence. Write-ups, like negative performance evaluations, do not constitute adverse employment actions. *See Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (noting that negative performance evaluations together with probation might be an adverse employment action); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of … employment are not adverse employment actions."); *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) (the plaintiff's oral and written reprimands were not adverse employment actions because she did not show they had any immediate consequences). Plaintiffs' numerous allegations of receiving write-ups for being tardy, among other things, are not adverse employment actions.

Finally, in incident (6), Rogers claims that when she gave her two weeks' notice, she was not permitted to work the remaining two weeks. She was paid for those two weeks, but lost the opportunity to earn tips. There are no facts in the record saying whether Rogers was entitled to work the remaining two weeks or whether it was within defendant's discretion to let her go immediately. One district court held that an immediate termination was not an adverse employment action, because two weeks' notice is "a traditional courtesy the employee extends to the employer," *Wynn v. Paragon Sys., Inc.*, 301 F. Supp. 2d 1343, 1354 (S.D. Ga. 2004), while another district court held that such a termination was, *Rodriguez v. Wet Ink, LLC*, 08-CV-00857-MSK-CBS, 2012 WL 1079006, at *8 (D. Colo. Mar. 30, 2012), though the former termination was with severance pay and the latter was without. Since Rogers does not support her argument with citations to relevant legal authority (the single citation to *Knox* is not particularly relevant), or facts in the record to indicate whether defendant's decision was within its discretion, the Court finds that Rogers

20

has waived it. *See* SDIL-LR 7.1(d).[10]

Plaintiffs have not shown the existence of an adverse employment action, a required element of her Title VII race-discrimination claims, and retaliation claims, under both the direct and indirect methods of proof. Since they have failed to show the existence of a genuine dispute on a necessary element of their claims, defendant is entitled to judgment as a matter of law as to these claims. *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). The Court also finds below that plaintiffs cannot prevail under the direct or indirect methods of proof.

*B. Direct method*

Under the direct method of proof, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011); *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008). "Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it 'uniquely reveals' the employer's intent to discriminate." *Diaz*, 653 F.3d at 587 (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005)); *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). Circumstantial evidence, which is more common, "'suggests discrimination albeit through a longer chain of inferences.'" *Diaz*, 653 F.3d at 587 (quoting *Hasan*, 552 F.3d at 527). "A plaintiff can survive summary judgment

---

[10] The Court also notes that Rogers did not raise this claim in the amended complaint (Doc. 5) or seek leave to amend the complaint to include it. She asserted only that she resigned in May 2010, without mentioning that she had expected to continue working and lost tips. She cannot raise a new claim in response to a motion for summary judgment.

by producing either type of evidence as long as it creates a triable issue on whether discrimination motivated the employment action." *Id.* Our cases point to three categories of circumstantial evidence:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group;
> (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and
> (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Darchak*, 580 F.3d at 631; *accord Diaz*, 653 F.3d at 587.

Defendant's motions for summary judgment argue that neither plaintiff has produced evidence of a decisionmaker's admission indicating that an adverse employment action was motivated by discriminatory animus or a desire to retaliate. Neither plaintiff has produced evidence of any racial slurs, or statements of dislike for a particular race, by any person who made an adverse employment decision against her. *See Owens v. Sandee Mfg. Co.*, No. 93 C 6509, 1994 WL 384031, at *3 (N.D. Ill. 1994) (finding that racial remarks made by the plaintiff's supervisor and personnel manager gave rise to the reasonable inference that the plaintiff's firing was racially motivated).

Plaintiffs respond that their circumstantial evidence includes "many incidents of unequal treatment about which [they] testified" (Doc. 51, p. 17; Doc. 50, p. 18). They do not, however, specify which incidents or how they relate to their asserted adverse employment actions. For example, evidence of discrimination, even damning evidence like racial comments, needs to have happened relatively close in time to the adverse employment action. *See Diaz*, 653 F.3d at 589 (noting there must be something, such as temporal proximity, to link racially inflected comments and the adverse employment action); *Darchak*, 580

F.3d at 632; *see also McCarthy v. Kemper Life Ins. Co.*, 924 F.2d 683, 686–87 (7th Cir. 1991) ("Unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge."). Alexander, for example, does not established any evidence suggestive of racial animus that happened relatively close in time to the three days in July 2009 when she was moved from her table-game area and assigned to cover another area. Nor does she discuss any of her other asserted adverse employment actions. Rogers's response brief suffers from the same deficiency. The Court notes that plaintiffs do not argue that "similarly situated employees outside the protected class received systematically better treatment." *Darchak*, 580 F.3d at 631. The record is devoid of evidence which would support a finding of racial animus in any of the alleged actions.

Both plaintiffs piggyback on one another's allegations that they were treated less favorably than white waitresses with respect to discipline and floor assignments. They note that Carey was in charge of discipline, scheduling, and floor assignments for all cocktail waitresses during the relevant time period (Doc. 37, Ex. 2, ¶¶ 2–3). Yet the parties are required to support their assertions by citing to "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). It is not the Court's task to search through Rogers's affidavit to find the instances Alexander is relying on. *See, e.g.*, *Greer v. Bd. of Educ. of City of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001) ("[A] lawsuit is not a game of hunt the peanut."). For example, in her affidavit, Rogers says Carey "frequently" came in and stood at the sink washing her hands (Doc. 50, Ex. 1, ¶ 2). She believed Carey was monitoring how long she spent in the restroom and says she did not see Carey follow white waitresses into the restroom (*id.*). Alexander does not, however, offer any testimony from Carey about whether she was actually monitoring Rogers. Alexander does not offer testimony from any white waitresses as to whether they were also followed into the restrooms. And it is difficult to see how, even if it was true that Carey was monitoring Rogers, that would give rise to an

inference of discriminatory intent behind the day-to-day reassignment of shifts, one of plaintiffs' alleged adverse employment actions.

Plaintiffs believe they have more circumstantial evidence than the plaintiffs had in *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582 (7th Cir. 2011), where the court of appeals found that the district court erred in not considering certain circumstantial evidence of discrimination. The court of appeals noted the importance of temporal proximity, though, and that, under the direct method of proof, the evidence must "point directly" to a discriminatory reason for the employer's action. *Diaz*, 653 F.3d at 589, 590 (citing *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008)). Plaintiffs do not provide evidence that points directly to discriminatory reasons for their alleged adverse employment actions.[11]

*C. Indirect method*

Plaintiffs also proceed in their Title VII claims by showing disparate treatment under the indirect method of proof, the *McDonnell Douglas* burden-shifting method. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this method, the plaintiff first must establish a prima facie case of discrimination by showing (1) she belongs to a protected class, (2) her performance met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees not in the protected class received more favorable treatment. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1034 (7th Cir. 2004). Once the prima facie case is established, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason'" for its action. *Coleman*, 667 F.3d at 845 (quoting *McDonnell Douglas*, 411 U.S. at 804). If the defendant does that, the burden shifts back to the plaintiff to show that the employer's reason is pretext. *Id.*

---

[11] The rest of plaintiffs' evidence consists of deposition testimony from *Riley-Jackson*, which is not admissible.

Defendant concedes the first two elements. As noted earlier, neither plaintiff has established that she suffered an adverse employment action, so they cannot establish their prima facie case. The Court need not proceed further. *See Williams*, 361 F.3d at1034. But the Court also finds that plaintiffs are unable to meet the fourth element here, that similarly situation employees not in the protected class received more favorable treatment.

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). "Its purpose is to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Coleman*, 667 F.3d at 846 (quoting *Humphries*, 474 F.3d at 405). The similarly situated employee need only be comparable, not a clone. *Id.* Generally the plaintiff must at least show that the similarly situated employee (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct "'without such differentiating or mitigating circumstances as would distinguish [her] conduct or the employer's treatment of [her]." *Coleman*, 667 F.3d at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

The first two elements are not at issue. Carey was in charge of employee discipline, as well as scheduling and floor assignments, for all the cocktail waitresses, so the white waitresses plaintiffs' mention dealt with the same supervisor and were subject to the same standards. However, regarding the third element, plaintiffs do not show that the white cocktail waitresses engaged in similar conduct without differentiating circumstances. They say Kim Lay, Nicole Khoury, "Susan,"[12] and others "received better treatment" than they

---

[12] Susan is a waitress referenced in a deposition from the *Riley-Jackson* case, which is not admissible here.

did "with respect to discipline and privileges" (Doc. 51, p. 21). Regarding disciplinary is-sues, in incident (3), Alexander and Rogers arrived late for work and were sent home. Al-exander was also suspended for a day; in incident (4) Alexander was suspended and fired for being absent and not calling in, and because she had been absent earlier in the year (while on FMLA leave).[13] They point to Nicole Khoury who arrived over two hours late but was permitted to work the rest of her shift.[14] Yet there is no evidence that Khoury was not suspended, as Alexander was, or otherwise disciplined. Plaintiffs did not depose either Khoury or Carey to find out. The same applies to Kim Lay. Plaintiffs allege that Lay rou-tinely arrived at her work station late after clocking in, without offering any evidence of whether Lay was disciplined or suspended. There is also no evidence that Carey knew Lay was arriving late. Plaintiffs cannot establish that these waitresses were similarly situated without evidence. *See Rogers v. City of Chi.*, 320 F.3d 748, 755-56 (7th Cir. 2003) ("When plaintiffs proceeding under the burden-shifting formula of *McDonnell Douglas* cannot produce *competent evidence* that they were treated differently than similarly situated em-ployees, we must affirm the granting of summary judgment on that basis." (emphasis add-ed)).

The other two incidents plaintiffs cite as adverse employment actions were (1) that they were reassigned several times per week from their bidded areas of the casino floor, and (2) the removal of the dollar slot machines from Alexander's area. They assert that when they were reassigned, white waitresses took over their areas. The Court does not find that is a valid comparison. Plaintiffs need to show that a white cocktail waitress was not al-so reassigned from her own bidded area to cover other areas for absent waitresses. They must show that a similarly situated individual was treated more favorably, which in this

---

[13] They also claim incident (5), in which various write-ups were made against them. There was no legal basis for that claim, so the Court declines to address it again here. The Court also declines to address Rogers's in-cident (6) because she waived it.
[14] We do not actually know how late Khoury was that day; in her affidavit, Rogers said Khoury arrived "late" on May 29, 2009.

case means a waitress was not reassigned from her preferred area to cover for absent wait-resses. Regarding the dollar slot machines, Alexander does not allege that any other wait-ress was allowed to keep her slot machines or gaming tables without having them moved or given to another waitress.[15] Accordingly, plaintiffs cannot establish a prima facie case of discrimination because they do not show that a similarly situated employee engaged in similar conduct without differentiating circumstances that would distinguish her conduct or defendant's treatment of her.

### D. Hostile work environment

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's em-ployment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). An ac-tionable hostile-work-environment claim requires the plaintiff to prove: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005); *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). Factors that may be considered in deciding whether the environment is hostile or abusive "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it un-reasonably interferes with an employee's work performance." *Mendenhall*, 419 F.3d at 691 (quoting *Harris*, 510 U.S. at 23).

Plaintiffs argue that defendant's motion is "skeletal," with only one sentence, and

---

[15] Alexander acknowledged in a deposition that Carey was not responsible for moving the slot machines (Doc. 37, Ex. 1, 220:10–11). She says the "gaming guys" were, and she does not believe they were discrimi-nating against her (*id.*, 220:10–20). Moreover, Carey could not control when the gaming guys decide to move slot machines (*id.*, 220:20–22).

should not be taken seriously. They assert that they were subject to a "laundry list" of in-dignities against African-American employees; that they attended meetings in which other black cocktail waitresses made complaints similar to theirs; and that they received, ob-served, and heard about enough unfair treatment to establish an objectively and subjective-ly hostile work environment, which humiliated them and interfered with their work per-formance.

The sum of plaintiffs' claim is that they were monitored too closely and were disci-plined when they did not believe white cocktail waitresses were being similarly disci-plined, although they have no evidence of whether those waitresses were disciplined. Al-exander says she liked everything about her job except Kelly Carey; if Carey were gone, she would not have filed this lawsuit (Doc. 37, Ex. 1, 283–84). She has never heard Carey use a racial slur or say anything derogatory about African-Americans (*id.*, 197:9–15). Rog-ers has never heard a racial slur by anyone in management (Doc. 38, Ex. 1, 181:18–23). In considering the facts of this case, the Court is hard-pressed to find evidence of discrimina-tory conduct, let alone frequent or severe discriminatory conduct. There was no physically threatening or humiliating behavior. Plaintiffs' allegations, such as that they "heard about" unfair treatment, does not persuade the Court that the conduct of defendant's employees, Carey in particular, rose to the level of being objectively offensive. Thus the Court does not find that plaintiffs have established specific facts showing that there is a genuine issue for trial on their hostile-work-environment claim.


*E. Retaliation*

As with discrimination claims, a retaliation claim may be established by either the direct or indirect methods of proof. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012); *Weber v. Universities Research Ass'n*, 621 F.3d 589, 592 (7th Cir. 2010). Plaintiffs here proceed under the indirect method. To survive summary judgment under the indirect

method, a plaintiff must establish that she engaged in statutorily protected activity, performed her job to her employer's legitimate expectations, suffered an adverse employment action, and was treated less favorably than similarly situated employees who did not engage in that protected activity. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012); *Dear v. Shinseki*, 578 F.3d 605, 610–11 (7th Cir. 2009).

The parties agree that plaintiffs engaged in protected activity by filing their original EEOC charges and lawsuit in 2007, *see Alexander v. Casino Queen Hotel and Casino*, Case No. 07-634-WDS-PMF, and their second charges of discrimination with the EEOC in 2009 and 2010. Plaintiffs also made numerous complaints about discrimination to Carey, Gramaglia, and others. Rogers complained to Gramaglia several times about the day-to-day reassignments from her assigned area. Then, one day, he responded that she was being insubordinate and sent her home before her shift was over.[16]

Plaintiffs contend that the evidence they offer under their indirect method of proof also establishes their retaliation claims. They believe that other employees who did not complain about race discrimination, *e.g.*, Kim Lay, were treated more favorably. However, as discussed above, plaintiffs have not established any adverse employment actions. And, because they have not established whether any other employees were disciplined, plaintiffs cannot show they were treated less favorably than similarly situated employees (who did not engage in protected activity). Their retaliation claims fail for both reasons.

*F. Miscellaneous arguments*

Defendant argues that plaintiffs failed to include their claims here in the charges they filed with the U.S. Equal Employment Opportunity Commission ("EEOC"). Thus, it suggests, plaintiffs' claims here are barred. *See, e.g.*, *Babcock v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir. 1985). Plaintiffs also bring their claims under § 1981, however, and

---

[16] Rogers does not claim that being sent home that day was an adverse employment action; she offers it as evidence of retaliatory motive.

§ 1981 claims do not require charges to have been filed with the EEOC before bringing a federal lawsuit. *Smith v. Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012) (noting difference between § 1981 and Title VII); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007). So plaintiffs' claims are not barred.

Plaintiffs previously filed a lawsuit against defendant and made many arguments similar to the ones they are making now. *See Alexander v. Casino Queen Hotel and Casino*, Case No. 07-634-WDS-PMF. In light of that lawsuit, the Court granted, in part, defendant's motion to dismiss based on res judicata, holding that plaintiffs' claims in this lawsuit would be limited to those that arose after October 11, 2007 (Doc. 21). Defendant now raises the same arguments again. But the incidents plaintiffs cite in their response and affidavits occurred after October 2007. They are not barred.

Finally, defendant again argues that it should be entitled to attorney's fees and costs if the Court grants its motions for summary judgment. It contends that plaintiffs' claims are frivolous and that plaintiffs did not conduct discovery to establish evidence in support of their claims. Defendant made documents available for inspection pursuant to plaintiffs' requests, but plaintiffs did not inspect or copy any documents. Plaintiffs did not request or take any depositions. Nonetheless, defendant does not cite any legal authority showing that it is entitled to attorney's fees. The Court declines to consider it.

## VI. CONCLUSION

Plaintiffs Stacy Alexander and Kim Rogers have not established that they experienced an adverse employment action or that similarly situated employees were treated more favorably than they were, which disposes of their race-discrimination and retaliation claims. They also have not established their claim of a hostile work environment. The Court **FINDS** that defendant Casino Queen, Inc. is entitled to judgment as a matter of law. Accordingly, defendant's motions for summary judgment (Docs. 37, 38) are **GRANTED**.

Plaintiffs' motion to strike (Docs. 56, 57) is **DENIED**. The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: <u>October 24, 2012</u>**

<u>/s/ WILLIAM D. STIEHL</u>
**DISTRICT JUDGE**